Moncure, P.,
delivered the opinion of the court.
This is an appeal from a decree of the circuit court of the city of Richmond, rendered on the 20th day of Ootober 1876, in a suit in said court in which the appellants were plaintiffs and John A. Lynham, escheator for the commonwealth of Virginia, was defendant. Solomon Hauenstein, a citizen of Switzerland, had emigrated to Virginia, and settled here many years ago; had continued to reside here until his death; had acquired, by purchase and conveyance •at different times, in the years 1856 and 1858, and from different persons, quite a large real estate, of which he continued to be seized and possessed until ■and at the time of his death; and he died in 1861 or ’2, intestate, unmarried and without issue. Having no known heirs, it was supposed that his estate devolved on the commonwealth for defect of heirs. There was an inquisition of escheat, which found accordingly; and the said estate came to the hands of the said Lynham as escheator, who was proceeding to sell the same in the execution of his duties as such, when the appellants, citizens of Switzerland, claiming to be the next of kin, or their representatives, of the said intestate, and to be entitled as such to his said estate, or the proceeds of the sale thereof, filed their petition for the recovery of the same, under the Code of 1860, chapter 113, section 8, page 547, which enacts *64 that “when the verdict on such inquest is for the-x commonwealth, any person claiming any interest in lands (escheated), whether legal or equitable, may, t,epore gaie thereof, petition the said circuit court (to which the inquisition is directed to be returned), \ 1 77 for redress. To such petition the escheator shall be a defendant. He shall file an answer, stating the objections to the • claim. And the cause shall be heard without any unnecessary delay, upon the petition, answer and the evidence.”
In the petition, the petitioners expressed their willingness to unite in a sale of the property by theescheator. To this petition, the escheator accordingly filed an answer, stating the objections to the claim. Evidence was taken and filed on both sides, but chiefly on the side of the petitioners, and especially to prove-that they were,-in fact, as they claimed to be, the next of kin of the said intestate, or their representatives. On the 20th day of October 1876, and during the same-year in which the petition was filed, the cause came on for final hearing; when the court, being of opinion that the plaintiffs had no claim upon the fund arising-from the sale of the real estate disposed of by the escheator (but without deciding whether the petitioners were the next of kin, or their representatives, of the intestate, as they claimed to be), therefore dismissed the petition, and decreed that the petitioners pay to-the defendant his' costs by him about his defence in that behalf expended. From that decree the petitioners applied to a judge of this court for an appeal,, which was accordingly allowed, -and which is the ease now to be disposed of by this court.
We proceed at once to enquire whether the appellants are entitled to the estate of the intestate Solomon Hauenstein, or the proceeds of the sale thereof* *65 even if they be in fact, as they claim to be, his next of J 7 J 3 kin, or their representatives, which latter question will not be decided, unless its decision be rendered neees- » • r. • i • • sary for the decision of this case by our opinion on and decision of the question first above propounded.
If the appellants, who are citizens of Switzerland and aliens to the commonwealth of Virginia, be entitled to the estate, or the proceeds of the sale thereof, which they claim (even admitting them to be in fact the. next of kin of the said intestate), they must be so entitled either first under the common law; or, secondly, under some statute law of the state of Virginia; or, thirdly, under some treaty between the United States and the Republic of Switzerland.
1st. Are they entitled under the common law ? Certainly not. Under the common law an alien is incapable of taking real estate by descent. 1 Rob. Pr. (new) 125, and eases cited; 2 Kent’s Com., 58 marg.
2dly. Are they entitled under any statute law of the state? If there was any such law in existence at the time of the intestate’s death, in 1861 or 1862, it is embodied in the Code of 1860; for no law on the subject was enacted before his death and after the publication of the said Code. There is but one provision in that Code which can have any bearing on the subject; and that is the sixth section of chapter 115, page 557, which is in these words: “When by any treaty now in force between the United States and any foreign country, a citizen or subject of such country is allowed to sell real property in this state, such citizen or subject may sell and convey the same, and receive the proceeds thereof within the time prescribed by such treaty; and when by any treaty now in force between the United States and any foreign country, citizens of the United States are allowed to inherit, hold, sell and *66 eonvey real property lying in such foreign country, the citizens or subjects of such foreign country may in-hold, sell and convey real property lying in this gj.a£e. providecl, however, that such purchase, sale and. 5n^er^ance, hereinbefore mentioned, shall apply only to real estate, hereafter purchased and acquired by a citizen or subject of such foreign country.”
The former part of this section, down to the words, “by such treaty” inclusive, constituted the corresponding section of the same chapter of the Code of 1849, when it was engrafted for the first time in our statute law at the suggestion of the revisors who compiled that Code, for reasons set forth in a note to their reportj pp. 587-8. In that form the section remained in force, until it was amended and reenacted, as it stands in the Code of 1860 by an act passed April 7, 1858, acts of 1857-8, chap. 42, p. 44. The said former part of the section does not, and the corresponding section of the Code of 1849 did not, apply to such a case as this, in which there is no treaty in force between the United States and the foreign country of which the claimants are citizens, prescribing any time for their selling and conveying any real property in this state, and receiving the proceeds thereof. And the latter part of the said amended section does not apply to the case by reason of the proviso, which expressly limits its application to real estate purchased and acquired by a citizen or subject of such foreign country after the enactment of said amended section— Whereas, all the real.property in this state which was ever purchased and acquired by Solomon Hauenstein, was so purchased and acquired before such enactment. We do not mean to say, however, that it would apply to the case, even if there had been no such proviso; but it is unnecessary to decide that question.
*67 The appellants, then, are not entitled under the L 7 7 ^statute law to what they claim; and the only remaining inquiry is:
3dly. Are they entitled under any treaty between the United States and the republic of Switzerland? If they are, it is under the treaty between the two •countries which went into operation on the 9th day of November 1855, and has ever since remained in force, and so was in force at the time of the death of Solomon Hauenstein, in 1861 or ’62. It may be found in the 11th volume of the Statutes at Large of the United •States, page 590.
If they are entitled under this treaty, it is under article Y, which is in these words:
“The citizens of each of the contracting parties shall have power to dispose of their personal property within the jurisdiction of the other, by sale, testament, ■donation or in any other manner; and their heirs, whether by testament or ab intestato, or their successors, being citizens of the other party, shall succeed to the said property, or inherit it; and they may take possession thereof, either by themselves or by others acting for them, they may dispose of the same as they may think proper, paying no other charges than those to which the inhabitants of the country wherein the said property is situated shall be liable to pay in a similar case. In the absence of such heir, heirs, or other successors, the same care shall be taken by the authori ties for the preservation of the property, that would be taken for the preservation of -the property of a native of the same country, until the lawful proprietor •shall have had time to take measures for possessing himself of the same.”
“The foregoing provisions shall be applicable to real estate situated within the states of the American *68 Union, or within the cantons of the Swiss confederation, in which foreigners shall be entitled to hold or inherit real estate.”
“But in case real estate situated within the territories of one of the contracting parties should fall to a citizen of the other party, who, on account of his being an alien, could not be permitted to hold such property in the state or canton in which it may be situated, there shall be accorded to the said heir or other successor, such term as the laws of the state or canton will permit, to sell such property; he shall be at liberty at' all times, to withdraw and export the proceeds thereof without difficulty, and without paying to the government any other charges than those which, in a similar case, would be paid by an inhabitant of' the country in which the real estate may be situated.”
The first clause of this article relates only to personal estate, about which there is no difficulty; aliens being capable of acquiring, holding and transmitting movable property in like manner as our own citizens, without any enabling statute or treaty for that purpose. 2 Kent’s Com. 62, marg. Though there is a statutory provision to that effect in the Code of I860,, p. 557, § 5. There is no personal property involved in this controversy.
The second clause relates only to real estate situated in those states of the American Union, or cantons of' the Swiss confederation, in which foreigners shall be entitled to hold or inherit real estate. Wherever they are so entitled, the same reason exists for the application to such real estate of the provisions made by the first clause in regard to personal property. There were, no doubt, states in the American Union, at the time of the making of that treaty, in which foreigners, were entitled to hold or inherit real estate situated in *69 such states. But such was not the case in this state at that time, nor at the time of the death of Solomon Hauenstein, in 1861 or ’62. Though by a statutory provision since made, and to be found in the Code of 1873, eh. 4, § 18, p. 130, it is enacted, that “any alien, not an enemy, may acquire by purchase or descent, •and hold real estate in this state; and the same shall be transmitted in the same manner as real estate held by citizens.” But that provision has no relation to this case, which must of course be governed by the law which was in force at the time of such death.
The second clause has no relation to the real estate mentioned in the first and second sections of chapter 115 of the Code of 1860, page 557, by which any alien, being a free white person, and not an enemy, who shall before some court of record of this state, declare on •oath that he intends to continue to reside therein, is authorized, if he be actually resident therein, and upon such declaration being entered of record, to inherit or purchase, and hold, as if he were a citizen of this state. Bor although the second section declares, that ■“ any such alien may convey or devise any real estate •so held by him, and if he die intestate it shall descend to his heirs, and any such alienee, devisee or heir, whether a citizen or an alien, may take under such alienation, devise or descent,” yet it is, in said section, •expressly “provided he shall, if an alien, come or be in this state within five years after the alienation, devise or descent, and, before some court of record thereof, declare on oath that he intends to reside therein.” ISTo'w the second clause of the treaty was ■certainly not intended, and cannot have the effect, to abrogate such a provision as the one above mentioned, but was only intended to apply to a case in which the disability of alienage in regard to holding or inherit *70 ing real estate, was simply removed by statute; as is done by the 18th section of chapter 4 of the Code of' 1873, p. 130, before referred to. Almost always, if not always, when an alien makes the declaration on oath mentioned in the first section of chapter 115 of' the Code of 1860, he intends to become a citizen of' the state, besides becoming a permanent resident and owner of real estate therein. There was no occasion for saying anything in the section about his being naturalized, especially as it belongs to congress, under the constitution of the United States, “to establish a uniform rule of naturalization.” The fifth section of' the same chapter provides for the case of an alien who intends to reside in the state for a temporary period only, and authorizes him, if he reside therein, to-“take and hold any lands for the purpose of residence or of occupation by him or his servants, or for the purpose of any business, trade or manufacture for a term of years not exceeding twenty-one.”
This case therefore depends entirely on the true construction of the third clause of the fifth article of' the said treaty: “ But in case real estate,” &c. Under-this clause are the appellants, supposing them, as they claim to be, the next of kin, or their representatives,, of Solomon Hauenstein, entitled to sell the real estate-in Virginia, of which he died seized, and to withdraw and export therefrom the proceeds of such sale, unless-there be some statute law of the state authorizing-them to do so? Is not this clause of the treaty dependent for its operation and effect upon such state legislation, so far as this case is concerned? ¥e think that it is, and was intended so to be, by the framers of the treaty. Such seems to be the plain meaning of' the language used in the clause: “There shall be * accorded to the said heir or other successor such term. *71 as the laws of the state or canton will permit to sell such property.” These words, “ will permit,” seem to be wholly inconsistent with the idea of obligation on the part of the state to prescribe some period for such a sale, or of any right on the part of the person claiming to be such heir or successor, to sell such property in a reasonable or any other time, in case the state should not choose to permit such sale, and to prescribe a period for making it. The right contemplated in the said third clause was intended to be given, if at all, by the concurrent act of the treaty making power, and the state. Otherwise, no doubt the term or time during which the sale should be made, would have been prescribed by the treaty itself, as had been done by the treaty between the same powers of May 4, 1848. By that treaty it was expressly provided that “ a term of not less than three years shall be allowed to” the claimant “ to dispose of such property, and to collect and withdraw the proceeds thereof.” Why was not a similar provision made in the treaty of November 9, 1855 ? Obviously because it was intended that the consent and cooperation of the state should be necessary to give effect to that part of the treaty.
By the constitution of the United States, article VI, section 2, it is declared that “ this constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby; anything in the constitution or laws of any state to the contrary notwithstanding.” Code of 1860, page 21. Great effect is thus given to these treaties, although they are not acts of congress, but are made by the president by and with the advice and consent of the senate, pro *72 vided two-thirds of the senators present concur. Id., p. 19, Const. U. S., art. 11, section 11, clause 2. A treaty, like an act of congress, must be in pursuance of the constitution, and certainly not in conflict therewith. The territory of a state is peculiarly a subject for state legislation; and when it is acted on by federal power, the constitutionality of the action ought plaiuly to appear. In regard to provisions contained in some of the treaties between the United States and foreign countries, giving to aliens a right to claim land in the states by descent, or the proceeds of the sale thereof, and allowing them a certain term for selling the same, and withdrawing the proceeds of such sale, a question was raised by the re visors of the Code of Virginia in 1849 as to the constitutionality of such provisions, and to avoid a conflict between the two governments, state and federal, the revisors recommended the adoption of two sections in the Code,, which were adopted accordingly. See their note to their report, page 587, chap. 113, § 18. In 1 Rob. New Pr., pp. 131-133, the same views contained in the note are again presented. While we do not express any opinion on this question in this case, because it is not necessary to do so, may we not suppose that the framers of the treaty of 1855 intended to avoid the exercise of at least a doubtful power by omitting such a provision as is contained in the treaty of 1848, giving to the alien claimant a right to sell the real property of a decedent and withdraw the proceeds of sale in a limited period, and by inserting in its stead such a provision on the subject as is contained in the subsequent treaty of 1855? At all events, ought we not to construe the latter treaty according to the plain import of its words, rather than strain the words, for the purpose of arriving at what is called a liberal con *73 -struction, in reference to the claimants. These treaties are authorized to be made for the benefit of the states; and the power to permit or not to permit an alien heir to sell the property and remove the proceeds ■of sale, during a limited period may very safely be left to the discretion of the states.
We are therefore of opinion that under the treaty of 1855, the appellants, supposing them to be the next of kin of Solomon Hauenstein, or their representatives, are not entitled to the proceeds of the sale of his real estate, the laws of the state not having permitted them to sell such property or to withdraw or export the proceeds thereof; and that the decree of the court below ought to be affirmed.
The evidence in this case strongly tends to prove that the appellants are, as they claim to be, the next of kin, or representatives of next of kin, of Solomon Hauenstein; and as it seems to be just and right that generally a man’s next of kin, whether citizens or aliens, should succeed to his estate, real as well as personal, at his death intestate, it would have afforded us pleasure to have decided this case in favor of the appellants; but of course we were bound to decide it according to law, which, in our opinion, is ’against them. We are pleased to know, however, that it is competent to the legislature to afford them any relief to which they may be justly entitled, which we doubt notwill be done.
Christian, J.
I am constrained to express my unqualified dissent from the opinion of the court in this case.
I am of opinion that it is clearly proved in the record that the plaintiffs in error are the heirs at law ■of Solomon Hauenstein.
*74 This is not denied in the opinion of the court, but conceding this fact, it is held that they are not entitled to receive the proceeds of the real estate in the hands of the escheator Lynham, because the legislature of Virginia has failed to fix the period within which the heirs of an alien Swiss, who has acquired real estate in this state, may be permitted to sell the same.
In my view the whole question in this case must turn upon the true construction to be given to the treaties between the Swiss confederation and the-United States, interpreted with reference to the constitution of the United States.
The second section of the sixth article of the constitution of the United States is as follows:
“Article VI, section 2. This constitution and the-laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything-in the constitution or laws of any state to the contrary notwithstanding.”
This clause only declares a truth, which flows immediately and necessarily from the constitution of a national government. The laws made in pursuance of the constitution must of necessity be supreme. A law, by the very meaning of the term, includes supremacy. It is a rule which those to whom it is prescribed are bound to observe. This results from every political association.
So too in regard to treaties, there is equal reason why they should be held when made to be the supreme law of the land.
Treaties constitute solemn compacts of binding obligation among nations, and unless they are enforced *75 with strict fidelity, the gravest complications with foreign nations would ensue, affecting not only the commercial prosperity but the peace and honor of the nation. It is therefore indispensable that they should have the obligation and force of a law, that they may be executed by the judicial power, and be obeyed like other laws. After these solemn compacts have been entered into, and while they subsist they ought to have a positive binding efficacy as laws upon all the states and all the citizens of the states. The peace of the nation, its good faith and moral dignity indispensably require that all state laws should be subjected to their supremacy.
It is notorious, as a matter of history, that treaty stipulations were grossly disregarded by the states under the confederation. It was probably to obviate this very difficulty that this clause was inserted in the constitution; and its renowned authors must forever be held in honored veneration, because among other declared principles of constitutional government they have brought treaties with foreign nations within the sanctuary of justice as laws of supreme obligation. See 2 Story on the Constitution, 4th ed., §§ 1838; and cases there cited; Ware v. Hylton, 3 Dal. R,. 270-277.
In Foster v. Neilson, 2 Pet. R. 253, 314, the supreme court said, “ A treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, especially as far as its object is infra-territorial; but is carried into execution by the sovereign powers to the instrument.
In the United States a different principle is established. Our constitution declares a treaty to be the supreme law of the land. It is therefore to be regarded by courts of justice as equivalent to an act of the legislature.” See also 5 *76 Marshall’s Life of Wash. eh. 8, p. 652; 1 Waite’s State Papers 45, 47, 71, 81.
“A. treaty,” said Mr. Jefferson, “made by the pregyen^ concurrence of the senate, is the law land, and a law of a supreme order, because it not only repeals former laws, but cannot itself be repealed by future ones.”
Now bearing in mind this interpretation of the constitution with reference to the obligatory force and acknowledged supremacy of the treaties made by the United States with foreign nations, let us now consider the terms of the treaties entered into between the Swiss confederation and the United States with respect to the rights secured to the subjects of the respective governments, to remove the proceeds of real estate, in cases where by the laws of the respective countries they cannot inherit such estate.
The treaty of 1847 contained the following provisions :
“Art. II. If by the death of a person owning real property in the territory of one of the high contracting parties such property ([i. e., real estate) should descend, either by the laws of the country or by testamentary disposition, to a citizen of the other party, who, on account of his being an alien, could not be permitted to retain the actual possession of such property, a term of not less than three years shall be alallowed to him to dispose of such property and to collect and withdraw the proceeds thereof, without paying to the government any other charges than those which in a similar case would be paid by an inhabitant of the country in which such real property may be situated.”
It is plain if this treaty was now subsisting between the Swiss confederation and the United States, there *77 could not be the shadow of a doubt that if within three years after the death of Solomon Hauenstein, the plaintiffs in error, had applied for the proceeds of this real estate, the state of Virginia would have been powerless to have resisted their claim under the treaty of 1847. And they would have had the unquestioned right to receive and remove the proceeds by the express terms of the treaty. This must be, and is, conceded. But it is said that the treaty of 1855 governs this case, and that under that treaty the plaintiffs in error are deprived of their right to recover and remove the proceeds of the said real estate. Is this so ? Gan it be so? How when the two treaties are compared it is plain that the only difference, in respect to this subject, is this—while the treaty of 1847 by its terms fixed the time, at three years, within which the property or its proceeds may be removed, the treaty of 1855 fixed no time but left it to the states of the Union and the cantons respectively, to fix the period within which this privilege may be exercised. The lauguage of the treaty of 1855 (article 5) is this,— “ there shall be accorded to the said heir, or other successor, such term as the laws of the state or canton will permit to sell such pi’operty; he shall be af liberty at all times to withdraw and export the proceeds thereof without difficulty, and without paying to the government any other charges than those which in a similar case would be paid by an inhabitant of the country in which the real estate may be situated.”
How it is said that because the legislature has failed to fix the period within which the rights of the parties under 'this treaty may be exercised, these rights have been lost—and though these rights arise and are vested under a treaty which the constitution declares, to be the supreme law of the land, yet they are de *78 8troye<^ by the mere non-action of the legislature. How it must be conceded that no law of the legislature antagonistic to the rights of the plaintiffs in error under t^g j-rea{-y^ could be maintained in any court, state or federal, because the treaty is the supreme law of the land, “anything in the constitution or laws of the state to the contrary notwithstanding.” If, then, the rights of the plaintiffs in error vested in them by a solemn treaty cannot be divested by the constitution or laws of a state, if they cannot be touched by positive enactments, how can they be divested by mere non-action of the legislature in failing to fix a period within which the right may be exercised.
It is a solecism to say that treaties shall be the supreme law°of the land, if they may be defeated, or the rights of parties be divested by action or non-action of the state legislature. If the states may each, by the action or non-action of its legislature, hamper, impede and destroy rights vested under treaties, why should the general government make any treaties at all ? If the states at last are to confer, in their discretion, the rights which the constitution secures by treaty, why should any treaty be made at all by the general government?
The province of the constitution would be idle and nugatory if the states may fix the rights of parties, notwithstanding solemn treaty stipulations.
To my mind it is plain that the treaty of 1855 simply gave to the state the power, if it chose to exercise it, of fixing the period within which the right of removal of the proceeds of real estate might be exercised. The mere failure of the state to fix the term, certainly cannot deprive parties of rights vested under solemn treaties, which are declared to be the supreme law of the land. I should rather say that the non- *79 ■action of the legislature was a waiver of its right to fix the period for removal of the proceeds of real estate by the Swiss claimants, and that in the absence of such legislation it ■ may be done at any time after the death of the alien. I am therefore for reversing the judgment of the circuit court, and directing the executive to pay over the proceeds of the real estate of Solomon Hauenstein to his heirs at law.
Decree affirmed.